Jennifer L. BOUCHER, Alexis Snader, Cathryn M. Ungerman, Rexanne Johannes, Talya Anter, Catherine S. Biuso, Maggie Rozycki, Meghan Delehanty, Individually and on Behalf of all Others Similarly Situated, Plaintiffs–Appellants,

v.

SYRACUSE UNIVERSITY, Kenneth Shaw, Chancellor of Syracuse University, and John J. Crouthamel, Athletic Director of Syracuse University, Defendants–Appellees.

Docket No. 98–7678

United States Court of Appeals, Second Circuit.

Argued Dec. 15, 1998.

Decided Jan. 06, 1999.

Faith A. Seidenberg, Seidenberg and Strunk, Syracuse, NY, for Plaintiffs–Appellants.

Edward R. Conan, Bond Schoeneck & King, LLP, Syracuse, NY, for Defendants–Appellees.

Before: FEINBERG, CALABRESI, and SOTOMAYOR, Circuit Judges.

CALABRESI, Circuit Judge:

Former female club athletes at Syracuse University ("Syracuse" or "the University") appeal from an April 3, 1998 judgment of the United States District Court for the Northern District of New York (Frederick J. Scullin, Jr., J.) granting summary judgment to Syracuse on a Title IX accommodation claim. Plaintiffs also appeal two orders of June 12, 1996. The first such order dismissed their Title IX equal treatment claims, and the second conditionally certified a class.

We affirm in part, dismiss the appeal in part, and vacate and remand in part.

## FACTS AND PROCEDURAL HISTORY

Plaintiff students "individually and on behalf of all others similarly situated" filed suit in May of 1995 against Syracuse University, alleging numerous violations of Title IX of the Education Amendments of 1972, 20 U.S.C. §§ 1681–1688, and its governing regulations. Seven of the eight named plaintiffs were at that time members of Syracuse's club lacrosse team and the eighth was a member of the University's club softball team. All plaintiffs have since graduated from the University.

The plaintiffs argued that Syracuse discriminated against female athletes in its allocation of participation opportunities (which includes decisions regarding which varsity teams to field as well as how many opportunities for participation by female varsity athletes are thereby created as a result of those decisions).[1] Plaintiffs also alleged that Syracuse provided unequal benefits to varsity female athletes as compared to varsity male athletes, and provided unequal scholarship funding to varsity female athletes as compared to varsity male athletes.[2]

Plaintiffs sought class certification in view of the fact that college students are a fluid group and that without such certification, mootness issues would likely arise. See, e.g., Cook v. Colgate Univ., 992 F.2d 17, 19–20 (2d Cir.1993) (holding a Title IX appeal moot, once plaintiffs, seeking injunctive relief, had graduated). In their equal treatment claims, plaintiffs asked for declaratory and injunctive relief ordering the University to provide equal benefits and scholarships to varsity male and female athletes. In their accommodation claim, plaintiffs sought the establishment of varsity lacrosse and softball teams for women.

Just over 50% of the Syracuse's student population is female, yet, when this complaint was filed, women made up only 32.4% of its athletes. In its 1993–94 National Collegiate Athletic Association submission, Syracuse stated that of its 681 varsity student-athletes, 217 were women, while 464 were men. These numbers reflected a 19% disparity between the percentage of varsity athletes who were female and the percentage of the University's students who were female.[3]

1. This kind of Title IX claim is commonly referred to as an "accommodation" claim because it derives from the Title IX implementing regulations, which provide that in determining whether equal athletic opportunities for members of both sexes are available, the Office of Civil Rights of the Department of Education (the office charged with enforcement of Title IX) will consider, among other factors, "[w]hether the selection of sports and levels of competition effectively accommodate the interests and abilities of members of both sexes." 34 C.F.R. § 106.41(c)(1); see also Cohen v. Brown Univ., 991 F.2d 888, 897 (1st Cir.1993) ("Cohen I") (noting three major areas of regulatory compliance under Title IX: athletic financial assistance (scholarships), equivalence in other athletic benefits and opportunities, and effective accommodation of student interests and abilities).

2. These types of Title IX claims are generally referred to as "equal treatment" claims because they derive from the Title IX regulations found at 34 C.F.R. § 106.37(c) and 106.41(c)(2)-(10), which call for equal provision of athletic scholarships as well as equal provision of other athletic benefits and opportunities among the sexes.

3. Between 1990 and the time of the filing of this suit, the disparity between the percentage of varsity athletes who are female as compared to the percentage of the University's students who are female ranged from 19 to 22%.

At the time that this suit was begun in May of 1995, the University funded eleven men's varsity teams and nine women's varsity teams. Just prior to the filing of the complaint, Syracuse announced a plan to add two new varsity women's teams to its athletic program—women's varsity soccer and women's varsity lacrosse. These teams began to play, respectively, in the 1996–97 and the 1997–98 academic years, thus bringing the number of varsity teams funded by the school to eleven men's and eleven women's.[4]

The University established five of its nine women's varsity teams in 1971[5]—when it first funded women's varsity sports. It dropped one of these sports (fencing) in 1972, and replaced it with field hockey. Crew was added as a women's varsity team in 1977. Three additional women's sports were added to the varsity roster in 1981.[6] After 1981, no new women's varsity team was created by the University until the addition of the varsity soccer team in 1997. Thus, until the filing of this complaint in 1995, fourteen years passed by without the University creating any new women's varsity teams. In the course of this litigation, Syracuse announced plans to institute a varsity women's softball team which, according to the University's representations at oral argument, will begin play in the 1999–2000 academic year.

\* \* \* \*

On June 12, 1996, the district court granted summary judgment to the University on plaintiffs' equal treatment claims—those that challenged the alleged unequal allocation of benefits and scholarships between varsity men's and women's teams (brought under 34 C.F.R. § 106.41(c)(2)-(8), (10) and 34 C.F.R. § 106.37). The court held that since none of the named plaintiffs were varsity athletes, they did not have standing to assert the equal treatment claims. Its ruling on this issue was proper and we affirm the dismissal of plaintiffs' equal treatment claims substantially for the reasons the district court gave.

*See Boucher v. Syracuse Univ.*, No. 95–CV–620, 1996 WL 328444 (N.D.N.Y. June 12, 1996). At the same time, the court ruled that plaintiffs could go forward with their accommodation claim and additionally deemed that the plaintiffs could pursue an equal treatment claim challenging the allocation of funds between male and female *club* teams—an action that the plaintiffs had not brought and never litigated. *See id.* at \*4.

In a separate order issued the same day, the district court held that the plaintiffs' proposed class included members with conflicting interests. *See Boucher v. Syracuse Univ.*, No. 95–CV620, 1996 WL 328441, at \*2 & n. 2 (N.D.N.Y. June 12, 1996). Finding that "the factual allegations [of plaintiffs' complaint] only address the need for women's varsity lacrosse and women's varsity softball," the court defined two possible classes: present and future lacrosse players who desire to play varsity lacrosse, and present and future softball players who want to play varsity softball. *Id.* at \*2.

The district court reached its conclusion as to appropriate classes by analyzing whether lacrosse and softball players could exist together as one class under Rule 23. That rule requires that: (1) questions of law or fact are common to the class; (2) claims or defenses of the representative parties are typical of those of the class; (3) class representatives are members of the class who possess the same interests and suffered the same injuries as class members; and (4) members of the class are so numerous that joinder would be impracticable. *See* Fed.R.Civ.P. 23(a). Although it found that commonality and typicality existed, the court determined that the two classes were in conflict because " 'in an era of static enrollment and increasing financial demands on institutions of higher learning, the resources available for intercollegiate athletic programs are finite' " and hence that compliance might well be achieved by the elevation of one sport and not the other.

---

4. It is the case, however, that for Title IX accommodation purposes, it is the aggregate number of opportunities provided for each sex, and not the number of teams funded for each sex, that matters. *Cf. Cohen I*, 991 F.2d at 897.

5. These were basketball, fencing, swimming, tennis, and volleyball.

6. These were indoor track, outdoor track, and cross country.

*Boucher,* 1996 WL 328441, at *4 (quoting *Bryant v. Colgate Univ.,* 93–CV–1029, 1996 WL 328446, at *15 (N.D.N.Y. June 11, 1996)).

Since the majority of plaintiffs were lacrosse players, the court decided to certify only the current and future "would be" varsity lacrosse players. This certification was made conditional on a demonstration by plaintiffs that joinder of all relevant members of the class would be impractical.[7] *See id.* at *5. The district court did not certify a class of women, current and future, who wished to play varsity softball "because of the potential conflict of interest discussed above." *Id.* at *4 n. 4.

After a period of limited discovery, the district court granted summary judgment to the University on plaintiffs' accommodation claim. It found that although opportunities to participate in varsity athletics at Syracuse were not allocated equally between the sexes, the University nevertheless fell within one of the safe harbors set forth in the governing regulations of Title IX. *See Boucher v. Syracuse Univ.,* No. 95–CV–620, 1998 WL 167296, at *4 (N.D.N.Y. Apr.3, 1998). Under the implementing regulations, there are three safe harbor defenses to a claim of unequal accommodation of student interest in varsity athletics. *See* 34 C.F.R. § 106.41(c)(1); 44 Fed.Reg. 71413 (1979). The district court held that Syracuse met the requirements of the second safe harbor because it had "continued a practice of program expansion which is responsive to the abilities and interests of its student body." 1998 WL 167296, at *4.[8]

Specifically, the district court found that (1) Syracuse had a "strong history of adding women's sports programs"; (2) although between 1982 and 1995, the University had added no new varsity women's teams, it did

fund additional scholarships and provide enhanced facilities, coaching, and support services for its women varsity athletes; (3) between 1982 and 1995, the absolute number of female participants in varsity sports had increased from 148 to 217; and (4) Syracuse had established two new varsity women's teams since 1995 and planned to add a third in 1999–2000. *Id.*

Finally, the district court noted that in conducting the safe harbor analysis, a court "may consider whether there are any formal policies in place which might indicate that the institution is monitoring the pulse of its students' interests in anticipation of expansion." *Id.* Despite recognizing that the school had not established that it had any formal policy to allow students to voice their interests, the court concluded that "the best evidence of continued expansion is expansion itself." *Id.* Accordingly, it granted summary judgment to the University.

### DISCUSSION

#### A. Lacrosse.

■ Syracuse argues that this appeal is moot because it has already implemented a varsity women's lacrosse team and that there is, therefore, nothing left for the certified class to pursue. The plaintiffs counter that the appeal is not moot for two reasons. First, they state that they sought to amend their complaint in the district court to add a claim for damages and that the court improperly denied their motion. Second, they argue that their suit did not merely seek class certification of current and future students interested in playing varsity lacrosse, but that they also sought class certification of current and numerous future students interested in playing varsity softball, itself not yet a varsity sport.

---

7. The court also certified a class of club athletes to challenge the allocation of funds among male and female club sports teams, but, as noted earlier, the plaintiffs did not pursue this claim because it was not part of their complaint.

8. The court observed:

   Where a university has a practice of expanding its athletic program, approaching proportionality and meeting the needs of the under-represented gender; and continues to expand in response to its student body's interest and abilities, as well as that of secondary feeder

   schools; symmetry in athletic programs is not required under Title IX, and liability may be avoided. Under this "safe harbor" of a continuing practice of program expansion, courts look to the institution's past and continuing remedial efforts to provide nondiscriminatory participation opportunities through program expansion.

   1998 WL 167296, at *3 (citing *Cohen I,* 991 F.2d at 898; *Bryant,* 1996 WL 328446, at *10; 44 Fed.Reg. 71,413).

It may well be that mootness would have been avoided had plaintiffs originally requested damages in their complaint. *See Cook*, 992 F.2d at 19–20 (noting that "a viable claim for damages generally avoids mootness of the action," but finding a Title IX appeal moot where plaintiffs had graduated, had sought relief solely on their own behalf, and had not appealed the district court's denial of their request for damages); *see also id.* at 19 (holding that an interest in preserving an award of attorneys' fees "is insufficient, standing alone, to sustain jurisdiction"). A request for damages, however, will not avoid mootness if it was "inserted after the complaint was filed in an attempt to breathe life into a moribund dispute." *McCabe v. Nassau County Med. Ctr.*, 453 F.2d 698, 702 (2d Cir.1971).

In the case before us, plaintiffs did not seek to amend their complaint to add a damages claim until three months after the University filed its motion for summary judgment and six months after the district court granted the University leave to file that motion. Moreover, in their papers in opposition to the University's motion, plaintiffs' counsel represented that if the district court were to enter an order binding the University to its promise to establish varsity women's lacrosse and softball teams, then "plaintiffs shall submit an application for attorney's fees as *there is no longer a controversy between the parties*" (emphasis added). And on appeal, plaintiffs' counsel, despite being asked numerous times at oral argument to specify precisely what relief plaintiffs sought, failed ever to mention damages. *See Perrucci v. Gaffey*, 450 F.2d 356, 358 (2d Cir.1971) (dismissing appeal as moot where *pro se* plaintiff indicated at oral argument that he was not concerned with damages allegations). Under the circumstances, we are satisfied that the district court did not err in denying plaintiffs leave to amend their complaint to add a damages claim.[9]

We, therefore, hold that insofar as plaintiffs' complaint sought a varsity lacrosse team, the claim is now moot, given that the team has been created and is already participating in intercollegiate play. *See County of Los Angeles v. Davis*, 440 U.S. 625, 631–32, 99 S.Ct. 1379, 59 L.Ed.2d 642 (1979) (finding case moot where there was no reasonable expectation that the alleged violation would recur). Accordingly, we take no position on whether the safe harbor defense made by Syracuse and granted by the district court was valid.

### B. Softball.

Plaintiffs also contest the district court's failure to certify a sub-class of current and future women interested in playing varsity softball. They argue that this issue is not moot because such a team has not yet begun play. We agree with both contentions.

District judges have broad discretion over class definition.[10] But under Rule 23(c)(1), courts are "required to reassess their class rulings as the case develops." *Barnes v. The American Tobacco Co.*, 161 F.3d 127, 140 (3d Cir.1998) (citing *Kuehner v. Heckler*, 778 F.2d 152, 163 (3d Cir.1985)); *see also Marisol A. v. Giuliani*, 126 F.3d 372, 378–79 (2d Cir.1997) (affirming class certification but ordering a district court to divide the certified class into subclasses); *Richardson v. Byrd*, 709 F.2d 1016, 1019 (5th Cir. 1983) ("Under Rule 23 ... [t]he district judge must define, redefine, subclass, and decertify as appropriate in response to the progression of the case from assertion to facts."). And we agree with the Fifth Circuit that "[o]rdinarily, if a court discerns a con-

---

9. We therefore need not and do not reach the issue of whether damages can be recovered under Title IX absent a finding of discriminatory intent. Nor do we address the applicability of the Supreme Court's recent decision in *Gebser v. Lago Vista Indep. Sch. Dist.*, — U.S. —, 118 S.Ct. 1989, 141 L.Ed.2d 277 (1998), in which the Court held, in a Title IX case involving a student who alleged sexual harassment by her teacher, that the plaintiff student could not recover damages from her school district based on principles of respondeat superior or constructive notice. *See id.* 118 S.Ct. at 1997.

10. *See* Fed.R.Civ.P. 23(c)(4) ("When appropriate (A) an action may be brought or maintained as a class action with respect to particular issues, or (B) a class may be divided into subclasses and each subclass treated as a class, and the provisions of this rule shall then be construed and applied accordingly.").

flict ... the proper solution is to create subclasses of persons whose interests are in accord." *Payne v. Travenol Labs., Inc.*, 673 F.2d 798, 812 (5th Cir.1982). We conclude that although the district court correctly found potential conflicts between members of a class that included both women interested in playing varsity lacrosse and women who wished to play varsity softball, it should have certified two sub-classes—one for each sport—rather than certifying only one class and excluding from that class members of the second.

That being said, the University represented both to the district court and to this Court that a varsity women's softball team is in the process of being established, and that the team will begin play during the 1999–2000 academic year. Because full implementation of a varsity women's softball team would render the remaining live aspect of this case moot, we again choose not to reach the merits of the University's safe harbor defense, and prefer instead to remand the case to the district court with instructions to dismiss the case if the University completes its plan to institute a varsity women's softball team by the date indicated. Should the University not live up to its representations, the district court is ordered to certify a class of current and future women students interested in playing varsity softball and to revisit the merits of the case at that time.[11]

### C. Club Athletes.

Although nowhere in their complaint did plaintiffs challenge the allocation of funding between female and male club sports at Syracuse, the district court certified a class of female club athletes to prosecute such a claim. The plaintiffs did not pursue discovery or take any action on this claim—which was essentially created by the district court.

Nonetheless, the court granted summary judgment to Syracuse. This was error. A court cannot create a cause of action that a party did not raise (and has no intention of pursuing) and then decide the issue against that party. Beyond the fact that the court is without the power to do so, any ruling on such unargued claims makes law and may bind parties on issues not adequately presented. Such results are to be rigorously avoided. We therefore vacate the district court's ruling on this claim.

### D. A Broader Claim.

From time to time, appellants have suggested that their real claim in this suit is to represent all women, present and future, who wish to be varsity athletes at Syracuse—regardless of sport. And in this respect they suggest that "[i]nterest and ability rarely develop in a vacuum; they evolve as a function of opportunity and experience." *Cohen v. Brown Univ.*, 101 F.3d 155, 179 (1st Cir. 1996) ("*Cohen II*"), *cert. denied*, —— U.S. ——, 117 S.Ct. 1469, 137 L.Ed.2d 682 (1997). They add that it was to ensure such opportunities that Congress passed Title IX. For this reason, they further contend that the importance of Title IX cannot be overstated.[12]

We are inclined to agree. But just as the district court cannot establish a claim for equal treatment for club athletes when that is not presented, so also we cannot create a class of those women who are interested in varsity athletics at Syracuse generally when that issue was never clearly presented in the complaint nor during the prosecution of this case. Too often, both in their briefs, and at oral argument, plaintiffs in this case have made clear that their interests are more specific: equal treatment among varsity athletes, and varsity status for women's lacrosse and softball.[13] Accordingly, we take no posi-

**11.** We note additionally that should the district court need to certify a class of current and future women students interested in playing varsity softball at Syracuse, such a class would satisfy the numerosity requirement of Rule 23. Joinder of all relevant parties—when the class includes current female high school students weighing the decision to attend Syracuse based on its athletic offerings—is clearly impracticable.

**12.** Statistics show that by 1992, in comparison to when Title IX was enacted, the number of young women participating in sports had multiplied six times. *See* Grace–Marie Mowery, Comment & Casenote, *Creating Equal Opportunity for Female Coaches: Affirmative Action Under Title IX*, 66 U. Cin. L.Rev. 283, 283 (1997).

**13.** For example, in their response to Syracuse's motion for summary judgment on their accommodation claim, plaintiffs stated that if the dis-

**120**

tion on the merits of such a broader suit. *Cf.* *Cohen II*, 101 F.3d 155 (upholding suit brought by a similar class against Brown University); *Cohen I*, 991 F.2d 888. It, and the applicability or not of the safe harbor provisions of Title IX as defenses to it, are simply not before us.

\* \* \* \*

We affirm the district court's dismissal of the plaintiffs' equal treatment claims with respect to varsity athletes for lack of standing. We dismiss the plaintiffs' appeal as to varsity lacrosse as moot. We vacate the district court's class certification order and its order granting summary judgment to the defendant University on plaintiffs' equal treatment claim with respect to club athletes. We remand the case to the district court for further proceedings consistent with this opinion with respect to the plaintiffs' claim as to varsity softball.

AFFIRMED in part, DISMISSED in part, VACATED and REMANDED in part.

trict court bound Syracuse to its plan to implement varsity women's lacrosse and softball teams, then "plaintiffs shall submit an applica-tion for attorney's fees as there is no longer a controversy between the parties."