Donald SLAVEN, et al., Plaintiffs,

v.

BP AMERICA, INC., et al., Defendants.

No. CV 90–722 RJK.

United States District Court,
C.D. California.

Feb. 7, 2000.

Marc M. Seltzer, Susman Godfrey LLP, Los Angeles, CA, Merrill G. Davidoff, Peter Nordberg, Berger & Montague, P.C., Philadelphia, PA, Gretchen M. Nelson, Los Angeles, Stephen D. Oestreich, Wolf Popper LLP, New York City, Howard D. Sacks, San Pedro, CA, for Class Plaintiffs.

John J. Reilly, Matthew Vafidis, Laurie Webb Daniel, Haight Gardner Holland & Knight LLP, San Francisco, CA, David E.R. Woolley, Cogswell Woolley Nakazawa & Russell, Long Beach, CA, for Defendant American Trading Transportation Company, Inc.

William P. Barry, Long Beach, CA, for Defendants BP America, Inc., BP Oil Shipping Co., USA and BP Oil Supply Co.

Erich P. Wise, Nicholas S. Politas, Flynn Delich & Wise, Long Beach, CA, for Defendant Golden West Refining Co.

## ORDER PARTIALLY DECERTIFYING THE CLASS ACTION

KELLEHER, District Judge.

Defendants filed a joint motion to decertify the class of plaintiffs. Plaintiffs opposed the motion. The Court considered the papers and the record in this case, and heard extended oral argument on September 27, 1999. The Court now *grants in part* Defendants' motion to decertify the Plaintiff class.

1. The full history of this unique litigation is aptly summarized in the Ninth Circuit's opinion in

## INTRODUCTION

On February 7, 1990, the ship American Trader carried oil loaded from the Trans-Alaska pipeline from Alaska to California. Approximately one and one-half miles off the coast of Huntington Beach, the American Trader allegedly ran over its anchor, opening a hole in the hull of the ship. At least 200,000 gallons of crude oil spilled out into the Pacific Ocean and onto nearby beaches. Within days, numerous plaintiffs filed suit against an array of parties, including oil companies, shipping companies and the Alaskan Pipeline operators. The ensuing litigation has consumed this Court's attention ever since.[1]

Shortly after plaintiffs began to file suit against these defendants, the owner of the American Trader, American Trading Transportation Company, Inc. ("ATTRANSCO"), filed a Verified Complaint for Exoneration from or Limitation of Liability. *See* Verified Complaint (May 22, 1990). Plaintiffs moved to dismiss the Limitation Act Complaint in early 1991; the Court took the matter under submission while the Ninth Circuit determined whether the Trans-Alaska Pipeline Authorization Act ("TAPAA"), 43 U.S.C.A. § 1651 et seq. (West 1986), had repealed the Limitation Act. *See Holifield v. BP America, Inc.*, 786 F.Supp. 840, 852 (C.D.Cal. 1991). In September 1991, the Ninth Circuit ruled that "TAPAA implicitly repealed the Limitation Act with regard to the transportation of trans-Alaska oil." *In re Glacier Bay*, 944 F.2d 577, 583 (9th Cir.1991).

Early in the case, Plaintiffs moved for class certification, which this Court granted conditionally on May 25, 1994. The Court defined the class to consist of:

All persons and entities owning, leasing, or having an interest in real and/or personal property or having an ownership interest in commercial enterprises or working within or about the area or areas affected by the rupture of the hull of the American Trader on February 7, 1990, and the resulting oil spill and clean-up effort, who have suffered or will suffer economic dam-

*Slaven v. Attransco, Inc.*, 146 F.3d 1066, 1067–69 (9th Cir.1998).

age as a result of the spill and/or the ensuing clean-up effort.

Order Conditionally Certifying a Plaintiff Class 2 (May 25, 1994).

The class excluded tort claimants seeking damages for personal injuries, defendants, government agencies, and other political bodies. *See* id.

As part of the conditional certification Order, the Court required the parties to print notices of the pending action in newspapers and other prominent locations. The parties tabulated responses to these notices, and categorized the general nature of the respondents' claims. Approximately 180 potential claimants responded to the notices. Based upon the responses received, Defendants moved to decertify the class on the ground that Plaintiffs' legal and factual claims were not sufficiently common to warrant class treatment under Fed.R.Civ.P. 23. This Court denied Defendants' motion for decertification by Minute Order on April 26, 1995.

Since 1995, the parties have been occupied with settlement negotiations and substantive matters (and appeals therefrom) peripheral to the class certification issue. Now, four years later, Defendants have filed this Joint Motion to Decertify the Class.

## STANDARD

■ A party seeking class certification bears the burden of demonstrating that the proposed class satisfies the four elements of Rule 23(a), as well as the elements of at least one provision of Rule 23(b). *See Valentino v. Carter–Wallace, Inc.*, 97 F.3d 1227, 1234 (9th Cir.1996); *O'Connor v. Boeing North Am., Inc.*, 184 F.R.D. 311, 318 (C.D.Cal.1998) (Collins, J.). It follows, therefore, that a party seeking *decertification* of a class should bear the burden of demonstrating that the elements of Rule 23 have *not* been established. Defendants' burden in urging decertification is relatively heavy, since "doubts regarding the propriety of class certification should be resolved in favor of certification." *Groover v. Michelin North Am., Inc.*, 187 F.R.D. 662, 670 (M.D.Ala.1999) (*citing* 4 NEWBERG ON CLASS ACTIONS § 7540 (3d ed.1992)).

■ A district court's decision to decertify a class is committed to its sound discretion. *Cf. American Timber & Trading Co. v. First Nat'l Bank of Oregon*, 690 F.2d 781, 790 (9th Cir.1982) ("district court did not abuse its discretion in refusing to decertify subclass IV"); 5 MOORE'S FEDERAL PRACTICE § 23.04 (Matthew Bender 3d ed.1999). In general, a court's main concern is to determine "whether the class action device is a fair and efficient method of litigating the particular controversy." *Haley v. Medtronic, Inc.*, 169 F.R.D. 643, 647 (C.D.Cal.1996) (Rea, J.). In making that determination, a district court must undertake a " 'rigorous analysis' into whether the prerequisites of Rule 23 are met." *Valentino*, 97 F.3d at 1233, *citing In re American Medical Systems*, 75 F.3d 1069 (6th Cir.1996). Rigorous analysis requires a court to do more than offer brief and conclusory statements establishing the Rule 23 prerequisites. *See Valentino*, 97 F.3d at 1234–35. In effect, this Court must offer written reasons supporting its decision to maintain class certification, or, alternatively, to decertify the action.

## DISCUSSION

Before engaging in the analysis of Rule 23's requirements, the Court first addresses several threshold arguments raised by the parties.

## A. Defendants' Motion to Decertify the Class is not an impermissible motion to reconsider in violation of C.D. Local Rule 7.16.

This motion represents Defendants' second attempt to decertify the class conditionally certified by this Court on May 25, 1994. Plaintiffs have therefore castigated the motion as a thinly-disguised motion to reconsider. *See* C.D. Local Rule 7.16 (party may not bring motion to reconsider without emergence of new facts or law).

Plaintiffs fail to recognize, however, that this Court's usual reluctance to entertain motions for reconsideration simply does not apply in the class certification context. First, the governing law has changed since 1994, when the Court last entertained a motion pertaining to class certification. The Ninth

Circuit now requires a Court to undertake "rigorous analysis" in reaching class certification decisions. *See Valentino,* 97 F.3d at 1233. This Court conditionally certified the *Slaven* class without such analysis (and before *Valentino* was handed down). Consequently, both the Court and the parties will benefit from the instant motion to reconsider.

Second, even if Defendants *had* committed a facial violation of the Local Rule, their motion should be considered because of the special procedural role played by a district court in supervising the maintenance of a class action. *See, e.g., Ballard v. Equifax Check Serv., Inc.,* 186 F.R.D. 589, 593 n. 6 (E.D.Cal.1999) ("Because the court has the power to alter or amend the previous class certification order under Rule 23(c)(1), the court need not consider whether 'reconsideration' is also warranted under Fed.R.Civ.P. 60(b) or E.D. Local Rule 78–230(k) [, the counterpart to C.D. Local Rule 7.16].").

Under Fed.R.Civ.P. 23(c)(1) and (d), a court may amend its decision to certify a class "as may be desirable from time to time." A number of Circuits have held that a District Court must supervise a class to ensure that its continued maintenance satisfies the standards set forth in Rules 23(a) and (b)(3). *See, e.g., Boucher v. Syracuse Univ.,* 164 F.3d 113, 118 (2d Cir.1999) ("courts are 'required to reassess their class rulings as the case develops' "); *Richardson v. Byrd,* 709 F.2d 1016, 1019 (5th Cir.1983) ("The district judge must define, redefine, subclass and decertify as appropriate in response to the progression of the case from assertion to facts."). And the Ninth Circuit has stated that "before entry of a final judgment on the merits, a district court's order respecting class status is not final or irrevocable, but rather, it is inherently tentative." *Officers For Justice v. Civil Serv. Comm'n,* 688 F.2d 615, 633 (9th Cir.1982).

Defendants' motion thus serves an important role in the ongoing life of this class action. The motion offers this Court an opportunity to review the Rule 23 prerequisites with a view toward determining the continuing viability of the class action. Since the Court is obliged to review the Rule 23 prerequisites, the Defendants' motion seeking decertification provides a welcome opportunity for the Court to entertain adversarial debate as to whether this case proves a good candidate for Rule 23 treatment. *See Lamphere v. Brown Univ.,* 553 F.2d 714, 720 (1st Cir.1977) (advocating review of evidence, "possibly with the assistance of oral arguments and briefs" to determine whether class certification should remain). Because Defendants' motion assists the Court in performing its role as gatekeeper, or manager, of the class action, the motion should not be denied on the ground that it impermissibly recounts old facts and law under Local Rule 7.16.

**B. Length of time does not affect the Court's decision to certify or decertify.**

■ Plaintiffs advance the argument that the *Slaven* class cannot now be decertified because the individual members have relied upon their class status for more than five years. This argument may be quickly dispatched, since no party has a *right* to proceed via the class mechanism.

In a case temporally similar to the instant case, the Eleventh Circuit determined that:

> A district court may alter or amend its certification order anytime before its decision on the merits. Fed.R.Civ.P. 23(c)(1). Questions concerning class certification are left to the sound discretion of the district court. [Cite omitted.] Even after a certification order is entered, the judge remains free to modify it in the light of subsequent developments in the litigation. [Cites omitted.] Although a class decertification order entered *ten years* after commencement of the action is unusual and perhaps disfavored, we find no abuse of discretion in this case.

*Forehand v. Florida St. Hosp. at Chattahoochee,* 89 F.3d 1562, 1566–67 (11th Cir.1996) (emphasis added).

Accordingly, Plaintiffs cannot defeat Defendants' motion by virtue of their reliance upon a class proceeding. Such reliance is antithetical to Rule 23(c)(1).

**C. Defendants' argument that the Limitation of Liability Act precludes class certification is inapplicable.**

The Limitation Act permits shipowners to reduce their liability in a manner proportion-

ate to the value of their vessel. *See* 46 U.S.C.A. § 181 et seq. (West 1958).

A complaint for limitation pursuant to the Limitation of Liability Act, [46 U.S.C. §§ 181–189] permits a vessel owner to limit its liability for damage or loss arising out of a particular voyage to the value of the vessel plus pending freight charges (compensation for the carriage of goods) at the termination of the voyage. [Cite omitted.] The Act permits both American and foreign shipowners facing multiple suits arising out of one voyage to bring the claimants into one proceeding to apportion the owner's liability. Provided their lawsuits are subject to the orders of a district court, all damage claimants may be enjoined from maintaining separate suits and required instead to file their claims in the limitation proceeding. [Cite omitted.]

*In re Bowoon Sangsa Co., Ltd.,* 720 F.2d 595, 597–98 (9th Cir.1983).

Owners must file a petition within six months after the filing of claims against the owner or vessel. *See* id. at § 185. Such action was taken by ATTRANSCO in May 1990.

Invocation of the Limitation Act by a shipowner has important consequences for the viability of a class action proceeding. The Fifth Circuit has held that "a class action may not be instituted in a limitation proceeding." *Lloyd's Leasing Ltd. v. Bates,* 902 F.2d 368, 370 (5th Cir.1990). *Lloyd's Leasing* involves a factual scenario strikingly similar to that in *Slaven.* In *Lloyd's Leasing,* the M/T Alvenues [was] grounded in the Calcasieu River Bar Channel about eleven nautical miles south/southeast of Cameron, Louisiana. As a result of the grounding one of the ship's tanks cracked, spilling 65,500 barrels of crude oil into the waters of the Gulf of Mexico. Given the particular combination of tides and winds that existed at the time of the spill, the oil washed ashore on Galveston Island, approximately 70 miles west of the site of the grounding. Following the accident the pe-

titioners/appellees filed an admiralty limitation of liability action. Over 375 claimants filed claims against the petitioner and third party defendants. The trial court divided the claimants into four groups based on the type of damages sustained. One of these groups consisted of claimants who suffered damages from oil tracked onto their premises by tourists and beachgoers.

*Lloyd's Leasing Ltd. v. Conoco,* 868 F.2d 1447, 1448 (5th Cir.1989) (same case as *Lloyd's Leasing, Ltd. v. Bates* ).

■ The Fifth Circuit affirmed the district court's denial of class certification, concluding that the requirements of Rule 23 were fundamentally inconsistent with the unique procedural requirements of Supplemental Rule F, which governs admiralty claims.[2] The Fifth Circuit noted that Rule F employs an "opt-in" requirement, mandating that all potential claimants litigate their claims individually before a single District Court. In contrast, Federal Rule of Civil Procedure 23(b)(3) utilizes an "opt-out" procedure, permitting any potential claimant to avoid representative litigation if he or she chooses. The Circuit also noted that permitting opt-outs to avoid a global judgment under Rule 23 would run afoul of Rule F's wholly inclusive approach. In addition, the Fifth Circuit found that "the entire thrust of Supplemental Rule F is that each claimant must appear individually and this is obviously inconsistent with the class action." Consequently, the Fifth Circuit held that class action treatment was improper when proceedings were governed by the Limitation of Liability Act. *See Lloyd's Leasing Ltd. v. Bates,* 902 F.2d at 370.

The Ninth Circuit has not visited this remote region of class action jurisprudence. *Lloyd's Leasing* is the leading case and the only appellate decision on point. This Court was unable to locate a single case—reported or not—that disagreed with the holding of *Lloyd's Leasing.* This Court presumes,

---

**2.** To the extent that admiralty rules conflict with the Federal Rules of Civil Procedure, admiralty rules trump. *See* Supplemental Rule A for Certain Admiralty and Maritime Claims ("[t]he gen-

eral Rules of Civil Procedure ... [are] applicable to the foregoing proceedings except to the extent that they are inconsistent with these Supplemental Rules.").

therefore, that the rule of *Lloyd's Leasing* would be adopted by the Ninth Circuit.

But this case no longer involves the Limitation Act, so the rule of *Lloyd's Leasing* does not apply. In *Glacier Bay,* the Ninth Circuit ruled that TAPAA repealed the Limitation Act. *See Glacier Bay,* 944 F.2d at 583. Since this case unquestionably involves oil transported through the trans-Alaska pipeline, the Limitation Act does not apply. As a consequence, the class may not be decertified on the ground that the Limitation Act claim has continuing viability.

## D. Class Certification

To maintain class status, the plaintiff class must satisfy all four elements of Rule 23(a), as well as the dual requirements of Rule 23(b)(3). *See Valentino,* 97 F.3d at 1234. A class action may be maintained by a group of representative plaintiffs only if:

> (1) the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a).

### 1. Numerosity

A class must be "so numerous that joinder of all members is impracticable." Fed. R.Civ.P. 23(a)(1). Impracticability is not measured strictly by number, although numbers are important; rather, impracticability depends on the facts of each case. *See General Tel. Co. of the Northwest, Inc. v. EEOC,* 446 U.S. 318, 330, 100 S.Ct. 1698, 64 L.Ed.2d 319 (1980). As a general matter, courts have found that numerosity is satisfied when class size exceeds 40 members, but not satisfied when membership dips below 21. *See Ansari v. New York Univ.,* 179 F.R.D. 112, 114 (S.D.N.Y.1998) (citing a thorough review of cases in 5 MOORE'S FEDERAL PRACTICE § 23.22[3][a] (Matthew Bender 3d ed.1999)). The Ninth Circuit has not offered a precise numerical standard; other District Courts have, however, enacted presumptions that the numerosity requirement is satisfied by a showing of 25–30 members. *See, e.g., In re Kirschner Med. Corp. Sec. Litig.,* 139 F.R.D. 74, 78 (D.Md.1991); *EEOC v. Printing Indus. of Metropolitan Washington D.C., Inc.,* 92 F.R.D. 51, 53 (D.D.C.1981).

In addition, each *subclass* must satisfy the numerosity requirement independently. *See Officers for Justice v. Civil Service Comm'n of San Francisco,* 688 F.2d 615, 630 (9th Cir.1982). The Ninth Circuit has held that a subclass that fails to meet the prerequisites set forth in Rule 23 must be dismissed, or the subclass members must proceed on an individual basis. *See Betts v. Reliable Collection Agency,* 659 F.2d 1000, 1005 (9th Cir. 1981).

The *Slaven* class consists of five subclasses. The parties appear to have created a sixth, catch-all category, based on the responses received.

| Title of Subclass | Approx. Responses |
|---|---|
| 1. Commercial Fishermen | 80 |
| 2. Fish Processors and Distributors | 10 |
| 3. Commercial Boat Owners | 26 |
| 4. Motel/Hotel/Vacation Prop. Owners | 13 |
| 5. Local Business Owners | 34 |
| 6. Miscellaneous Claimants | 19 |
| **Total** | **182** |

The size of each subclass is determined by the number of persons who responded to the notice sent out in May/June 1994. Potential claimants were not required to respond to the notice in order to be included in the class. *See* Order Conditionally Certifying a Plaintiff Class, 6–7, Ex. A (May 25, 1994). Rather, the notice procedure was designed to assist the Court in determining the propriety of class treatment. It is possible, perhaps even likely, that the number of members in a subclass is higher than the response rate indicates, since potential members were not required to respond to the notice.

The Court's request for responses from potential class members was permissible—despite Rule 23(b)(3)'s opt-in doctrine—because the Court did not require members to respond to the notice. The Ninth Circuit has held that in such cases a district court abuses

its discretion if it "use[s] nonresponses to determine that the numerosity requirement has not been satisfied." *Bauman v. United States Dist. Ct.*, 557 F.2d 650, 658–59 (9th Cir.1977). Hence, the relatively low number of responses indicated in the Table above cannot compel decertification of any of the subclasses.

Plaintiffs have shown, by declaration, adequate evidence that these subclasses consist of a substantial number of persons and businesses. Indeed, Defendants do not seriously contest numerosity in their papers. Consequently, Plaintiffs satisfy the numerosity requirement.

### 2. Commonality

There must be "questions of law or fact common to the class." Fed.R.Civ.P. 23(a)(2). Most courts have construed the commonality requirement quite liberally. Not every issue in the case must be common to every class member. *See O'Connor*, 184 F.R.D. at 330. "Indeed, for the commonality requirement to be met, there must only be one single issue common to the proposed class." *Haley*, 169 F.R.D. at 648 (cites omitted); *cf. Hanlon*, 150 F.3d at 1019–20.

In the *Slaven* case, the Plaintiffs share common liability claims against the defendants for their involvement in the American Trader accident. All such claims implicate the conduct of the oil companies, transport companies, and their employees' actions on the day of the spill. These facts, and the legal theories they suggest, prove sufficient to overcome the low threshold established by Rule 23(a)(2). Consequently, the Plaintiffs can establish commonality.

### 3. Typicality

The claims or defenses of the representative parties must be "typical of the claims or defenses of the class." Fed.R.Civ.P. 23(a)(3). The typicality standard is satisfied if the representatives' claims are "reasonably coextensive with those of absent class members; they need not be substantially identical." *Hanlon*, 150 F.3d at 1020; *see Hanon v. Dataproducts Corp.*, 976 F.2d 497, 508–09 (9th Cir.1992) (typicality focuses on the claims and defenses asserted, not the specific facts). In other words, a party satisfies the typicality standard "if the representatives' claims stem from the same event or course of conduct as other class members' claims and are based on the same legal theory as the absent members." *Rosario v. Livaditis*, 963 F.2d 1013, 1018 (7th Cir.1992).

Defendants argue that the representative commercial fishermen are atypical representatives for the class, because they do not represent each of the types of fishing performed in the waters of Huntington Beach. The Court notes that lobstermen, dorymen, gill netters and purse seiners may all have been injured by the spill. Yet the named representatives do not represent each of these types of commercial fishing. Defendants contend that each such type of fisherman would have suffered distinct damages from the spill.

The Court resolves this problem, *infra*, by dividing the litigation of this case into two phases: (1) liability; and (2) causation and damages. *See* Section F. Since all fishermen—irrespective of fishing style—share the same factual basis for their liability claims, the named representatives are typical of other commercial fishermen with respect to liability. Defendants are correct, however, in their assertion that the class members differ widely as to the damages suffered and the manner in which damages were caused. Since no named representative could possibly have "typical" damages vis-a-vis the other class members, the causation and damage inquiries must be severed from the liability inquiry in order to preserve the Class. In conclusion, the class representatives possess the sort of liability claims brought against Defendants that other class members will share. With respect to liability only, the named representatives are sufficiently "typical."

The existence of subclasses presents an additional hurdle. Each subclass must be headed by a person who claims the same injury as the absent members of the subclass. *See, e.g. Payne v. Travenol Lab., Inc.*, 673 F.2d 798, 812 (5th Cir.1982) ("after the sole black male plaintiff, James Williams,

withdrew from the case, no named plaintiff existed to head a class of black males.")

Initially, the group of named representatives included ten members. Subsequently, two members withdrew their representation from the class.[3] The remaining eight members fit into the following subclasses:

- 6 Commercial Fishermen
- 1 Fish Processor/Distributor
- 1 Hotel/Motel Operator

For the three subclasses that *are* represented (Commercial Fishermen, Fish Processors, Motel/Hotel Operators), the representatives pursue claims typical of members of their respective subclasses. But for the three remaining subclasses (Commercial Boat Owners, Local Business Owners and Miscellaneous Claimants), no representative pursues claims typical of theirs. Since the typicality standard measures the degree to which the representatives' claims mirror the absent class members' claims, the lack of representation in three of the five subclasses indicates that those subclasses do not satisfy the typicality requirement of Rule 23(a).

This Court apparently has discretion to decertify these three subclasses for lack of typicality at this juncture. *See, e.g., Kirkwood v. Taylor*, 590 F.Supp. 1375, 1383–86 (D.Minn.1984). Rather than taking this bold step immediately, however, the Court will permit counsel for the class additional time in which to name new representatives for each of these three unrepresented subclasses. *See Satterwhite v. City of Greenville*, 634 F.2d 231, 231–32 (5th Cir.1981) (en banc).

Counsel for the class will be given thirty days from the date of this Order to name the appropriate representatives. If Class counsel fail to name new representatives for these subclasses, or name atypical representatives, then the Court will decertify the appropriate subclass or subclasses.

### 4. Adequacy of Representation

The representative parties must "fairly and adequately protect the interests of the class." Fed.R.Civ.P. 23(a)(4). "Resolution of two legal questions determines legal adequa-cy: (1) do the named plaintiffs and their counsel have any conflicts of interest with other class members and (2) will the named plaintiffs and their counsel prosecute the action vigorously on behalf of the class?" *Hanlon*, 150 F.3d at 1020 (*citing Lerwill v. Inflight Motion Pictures, Inc.*, 582 F.2d 507, 512 (9th Cir.1978)).

#### a. Conflicts of Interest

Conflicts most often appear in two factual contexts. First, in mass tort classes involving long-term, or chronic, injuries to a diverse population (such as the asbestos and Dalkon Shield cases), future claimants often stand to lose money in favor of present claimants if a global settlement is approved. In that case, the class representatives—present claimants—have pecuniary interests that conflict with the interests of future claimants. Second, conflicts between representatives and members of a plaintiff class may exist if the representatives are subject to unique defenses raised by the defendant. In *Slaven*, neither problem seems to exist. The class includes an identifiable group of plaintiffs devoid of future claimants; moreover, there do not appear to be any defenses applicable only to the representatives' claims.

Defendants argue that the representatives' interests may conflict with some class members because this Court and the District of Alaska have reached different conclusions regarding the applicability of the Robins Dry Dock rule to TAPAA cases. *Compare Slaven v. BP America, Inc.*, 786 F.Supp. 853, 857–65 (C.D.Cal.1992) (Kelleher, J.) *with In re Exxon Valdez*, 767 F.Supp. 1509, 1514 (D.Alaska 1991). The Defendants contend, apparently, that the class of commercial fishermen would adopt a different posture on appeal than other subclasses. Irrespective of how the Ninth Circuit might resolve the issue, however, the *Slaven* representatives and class members are in the same position *before this Court.* Thus, Defendants' contention of conflict appears poorly grounded.

---

**3.** Both Donald Slaven (July 13, 1993) and Gregory Kuglis (August 4, 1993) withdrew from their roles as class representatives by filing notice with the Court.

### b. Vigorous Prosecution

Courts usually review the qualifications and experience of attorneys litigating the case to determine adequacy of prosecution. *See, e.g. Haley,* 169 F.R.D. at 650. Plaintiffs' attorneys have managed this case for more than nine years. During that period, the attorneys have defended the putative class' positions with skill and verve. Defendants do not challenge Plaintiff counsel's representation of the class. The Court has every reason to conclude that counsel adequately represent the Class.

### E. The Requirements of Rule 23(b)(3)

A class action may be brought under Rule 23(b)(3) if the Court finds that:

> questions of law or fact common to the members of the class *predominate* over any questions affecting only individual members, and that a class action is *superior* to other available methods for the fair and efficient adjudication of the controversy.

Fed.R.Civ.P. 23(b)(3) (emphasis added).

### 1. Predominance of common issues

Class action treatment is appropriate, under Rule 23(b)(3), when common issues "present a significant aspect of the case and they can be resolved for all members of the class in a single adjudication." *Hanlon,* 150 F.3d at 1022. A court must decide "whether there are so many questions common to all of the plaintiffs that having class action treatment would be far more efficient than having a number of separate trials." *Haley,* 169 F.R.D. at 650.

In *Slaven,* the Class members unquestionably share common liability claims against the Defendants. But on questions of causation and damages, class members must present individualized proofs. For example, the damage caused to hotel operations by reductions in tourism could be largely attributable to the rainy El Nino year of 1990, and not the oil spill. The El Nino effect might have impacted the commercial fishermen completely differently: the increase in warming currents from the southern latitudes could have reduced the available fish population, so

that the fisherman would not have caught many fish even without the oil contamination.

The liability question appears to be the only common issue among the Plaintiffs. Defendants, or at least many of them, have virtually conceded their liability under some of the causes of action. Consequently, the liability issues have become less contentious, and far less complicated, than causation and damages issues. It is impossible to conclude that common issues "predominate" with respect to questions of causation and damages.

### 2. Superiority of the Class Mechanism

"A class action is the superior method for managing litigation if no realistic alternative exists." *Valentino,* 97 F.3d at 1234–35. The superiority requirement does not require that all issues be common to all parties, merely that "resolution of the common questions affect all or a substantial number of the class members." *Watson v. Shell Oil Co.,* 979 F.2d 1014, 1022 (5th Cir.1992) (cites omitted). The Circuits have debated whether divergence among class members' *damage* claims alone defeats the superiority requirement. *Compare Premier Elec. Construction Co. v. Nat'l Elec. Contractors Assn., Inc.,* 814 F.2d 358, 366 (7th Cir.1987) ("If the differences in the kinds of damages suffered are indeed substantial, perhaps it is mistaken to certify any class.") *with McCarthy v. Kleindienst,* 741 F.2d 1406, 1415 (D.C.Cir.1984) ("[T]he mere fact that damage awards will ultimately require individualized fact determinations is insufficient by itself to preclude class certification.").

A class action suit will efficiently resolve the liability questions in *Slaven.* All Plaintiffs seek to hold the Defendants responsible for their acts in causing the oil spill. And this Court has the power to isolate a common issue, such as liability, and proceed with class treatment on that issue alone. *See Valentino,* 97 F.3d at 1234.

But class treatment does *not* seem to be superior for other legal questions presented in *Slaven.* On questions of causation and damages, class treatment is not the only "realistic alternative" for "managing litigation." *Id.* at 1234–35. Indeed, class treatment is an *inferior* method of adjudicating

the causation and damages issues, since individual adjudications will be required in any event. *See Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 419 (5th Cir.1998) ("The predominance of individual-specific issues ... detracts from the superiority of the class action device in resolving these claims.").

The Court finds that class treatment is superior for questions of liability. On these questions, virtually all potential claimants share common factual proofs as to the conduct and behavior of Defendants at, and before, the time the American Trader hull ruptured. But class treatment is not superior for questions of causation and damages. Rarely will two Plaintiffs share in common proof of individual damages. Accordingly, the class must be decertified for purposes of causation and damages. *See* Fed.R.Civ.P. 23(c)(4)(A).

### F. Dividing the Case into Phases

Rule 42(b) permits a court to divide up a single action into separate trials, thereby treating individual claims in phases, rather than en masse. *See De Anda v. City of Long Beach,* 7 F.3d 1418, 1421 (9th Cir.1993). Rule 42(b) provides that

> The court, in furtherance of convenience or to avoid prejudice, or when separate trials will be conducive to expedition and economy may order a separate trial of any claim ...

Fed.R.Civ.P. 42(b).

The decision to bifurcate a trial rests within the sound discretion of the trial court. *See Calmar, Inc. v. Emson Research, Inc.,* 850 F.Supp. 861, 865 (C.D.Cal.1994) (Tevrizian, J.); *cf. Hilao v. Estate of Marcos,* 103 F.3d 767, 782 (9th Cir.1996).

To achieve economy, and to render the class mechanism feasible, the Court bifurcates the trial into two phases: (1) liability; and (2) causation and damages. The Court maintains class status solely for the determination of liability raised by Plaintiffs' remaining causes of action. If Plaintiffs prevail on the liability portion of their case, the Court will determine the appropriate method of adjudicating causation and damages issues at that juncture.

## DISPOSITION

The Court **orders** that the case be split into two phases for trial purposes:

(1) Liability; and

(2) Causation and Damages.

The Court **decertifies** the class for purposes of the causation and damages phase. The Court will determine the appropriate method of adjudicating those issues after the liability phase has been completed.

The Court **orders** counsel for the Plaintiff class to name adequate representatives to head each of the recognized subclasses no later than 30 days after the date of this Order. Defendants will be permitted two weeks to object to any such named representative.

IT IS SO ORDERED.